BETSY C. MANIFOLD (182450)
manifold@whafh.com
ALEX J. TRAMONTANO (276666)
tramontano@whafh.com
**WOLF HALDENSTEIN ADLER**
  **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA 92101
Telephone: 619/239-4599
Facsimile: 619/234-4599

*Attorneys for Plaintiff*

[*Additional Counsel Listed Below*]

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOSEPH CAETANO, Derivatively on Behalf of GOODRX HOLDINGS, INC., <br><br> Plaintiff, <br><br> v. <br><br> DOUGLAS HIRSCH, TREVOR BEZDEK, KARSTEN VOERMANN, CHRISTOPHER ADAMS, JULIE BRADLEY, DIPANJAN DEB, AGNES REY-GIRAUD, ADAM KAROL, JACQUELINE KOSECOFF, STEPHEN LESIEUR, and GREGORY MONDRE, <br><br> Defendants, <br><br> and, <br><br> GOODRX HOLDINGS, INC., <br><br> Nominal Defendant. | Case No.: <br><br><br> **VERIFIED SHARHOLDER DERIVATIVE COMPLAINT** <br><br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Joseph Caetano, by and through his undersigned counsel, derivatively on behalf of GoodRx Holdings, Inc. ("GoodRx" or the "Company"), submit this Verified Shareholder Derivative Complaint (the "Complaint"). Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by the Company with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought in the right, and for the benefit, of the Company against certain of its officers and directors seeking to remedy Defendants' violations of state and federal law that have occurred from September 23, 2020 through November 8, 2022 (the "Relevant Period") and have caused substantial harm to the Company.

2.     GoodRx is a Delaware corporation with principal executive offices in Santa Monica, California operates a price comparison platform for prescription drugs which, in many cases, offers consumers access to lower prices (through discount codes and coupons) for their medications. The Company generates most of its revenue from contracts with pharmacy benefit managers ("PBMs") who agree to pay the Company a commission on prescription drug purchases made by consumers who use the Company's discount codes and coupons at participating pharmacies. The Company also generates a portion of its revenue from subscription plans like the "Kroger Rx Savings Club," which provides "access [to] lower prescription prices at" pharmacies operated by The Kroger Co. ("Kroger").

3.     In connection with the Company's initial public offering ("IPO") on September 23, 2020, and throughout the remainder of the Relevant Period, Defendants

SHAREHOLDER DERIVATIVE COMPLAINT

(defined below) continuously touted the Company's strong relationships with pharmacies as a significant element of its business plan. Among other things, the Company repeatedly highlighted the Kroger Rx Savings Club—which provides "access [to] lower prescription prices at Kroger pharmacies, including over 100 common generic medications for free, $3.00, or $6.00 price points, and savings on more than 1,000 other generic medications." However, Defendants never informed shareholders of the material risk that Kroger, which accounted for nearly 25% of the Company's prescription transactions revenue, could unilaterally refuse to accept GoodRx's discounts.

4.    Company shareholders began to learn the truth about the risks of the Company's overdependence on Kroger (including the risk that, notwithstanding the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts) on May 9, 2022, when GoodRx revealed that, late in the first quarter of 2022, "a grocery chain had taken actions that impacted acceptance of discounts from most PBMs for a subset of drugs" and that this "impacted the acceptance of many PBM discounts for certain drugs at this grocer's stores." GoodRx further acknowledged that this disruption "could have an estimated revenue impact of roughly $30 million" in the second quarter of 2022—resulting in the Company announcing disappointing second quarter 2022 revenue guidance of only about $190 million.

5.    In the accompanying investor earnings call held that same day, Defendant Bezdek admitted that the use of GoodRx discounts at the "grocery chain" were responsible for nearly 25% of GoodRx's prescription transactions revenue. While Defendants refused to identify the grocer by name, analysts and media outlets quickly recognized that the unnamed grocery chain was Kroger.

6.    On this news, the price of GoodRx common stock plummeted $2.78 per share, or more than 25%, from a close of $10.75 per share on May 9, 2022, to close at $7.97 per share on May 10, 2022.

7.      On November 8, 2022, Defendants provided further information on the severity of the revenue impact from the Kroger disruption—with the Company estimating that the "impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40 million" and that the Company expected "a combined $45 million to $50 million estimated impact to prescription transactions revenue" for the fourth quarter of 2022. Defendants further acknowledged that the Company was seeking to enter into contractual relationships with pharmacies to prevent similar disruptions from occurring in the future.

8.      On this news, the price of GoodRx common stock declined an additional $1.18 per share, or more than 22%, from a close of $5.24 per share on November 8, 2022, to close at $4.06 per share on November 9, 2022.

## JURISDICTION

9.      This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 as the claims asserted herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"). This Court also has jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

10.      This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

11.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because: (i) the Company maintains its principal place of business in this District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to the

SHAREHOLDER DERIVATIVE COMPLAINT

Company, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

12. In connection with the acts, transactions, and conduct alleged herein, the Individual Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## THE PARTIES

### Plaintiff

13. **Plaintiff Joseph Caetano** is, and was at relevant times, a shareholder of the Company. Plaintiff currently owns 45,000 shares of GoodRx stock and initially purchased his shares in May 2022.  Plaintiff will fairly and adequately represent the interests of the shareholders in enforcing the rights of the corporation.

### Nominal Defendant

14. Nominal Defendant GoodRx is a Delaware corporation with its headquarters at 2701 Olympic Boulevard, Santa Monica, California, 90404. The Company's common stock trades on the NASDAQ Global Select Market ("NASDAQ") under the ticker symbol: "GDRX."

### Director Defendants

15. **Defendant Douglas Hirsch** ("Hirsch") co-founded GoodRx in September 2011 with Defendant Bezdek and has served as the Company's Chief Mission Officer since April 2023.  Defendant Hirsch has also served as a Company director since September 2011. Previously, he served as Co-CEO from the Company's founding until April 2023.  For the fiscal year ending on December 31, 2023 the ("2023 Fiscal Year"), Defendant Hirsch received $784,856 in total compensation from the Company. This included $500,000 in salary, $269,120 in non-equity incentive plan compensation, and $15,736 in all other compensation. For the fiscal year ending on December 31, 2022

SHAREHOLDER DERIVATIVE COMPLAINT

(the "2022 Fiscal Year"), Defendant Hirsch received $507,290 in compensation from the Company. This included $500,000 in salary and $7,290 in all other compensation. For the 2021 Fiscal Year, Defendant Hirsch received $879,104 in total compensation from the Company. This included $500,000 in salary, $357,176 in non-equity incentive plan compensation, and $21,928 in all other compensation. For the fiscal year ending on December 31, 2020 (the "2020 Fiscal Year"), Defendant Hirsch received $267,650,186 from the Company. This included $500,000 in salary, $785 in bonus awards, $266,662,480 in stock awards, $480,000 in non-equity incentive plan compensation, and $6,921 in all other compensation.

16.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Hirsch made the following sales of Company Class A common stock:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| 03/22/2021 | 131,066 | $36.63 | $4,800,410 |
| 06/23/2021 | 94,615 | $37.90 | $3,585,908 |
| 06/24/2021 | 34,760 | $38.49 | $1,337,815 |
| 09/24/2021 | 123,422 | $45.24 | $5,583,611 |
| 09/27/2021 | 5,952 | $43.26 | $257,483 |
| 12/15/2021 | 129,375 | $37.52 | $4,854,150 |

17.    In total, before the fraud was exposed, Defendant Hirsch sold 519,190 shares of Company Class A common stock on inside information, for which he received approximately $20,419,378 in proceeds. Defendant Hirsch's insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

18.    ***Defendant Trevor Bezdek*** ("Bezdek") co-founded GoodRx in September 2011 with Defendant Hirsch and has served as the Company's Chairman of the Board since April 2023 and as a Company director since 2011. Defendant Bezdek was

previously the Company's Co-CEO from the Company's founding until April 2023. For the 2023 Fiscal Year, Defendant Bezdek received $811,528 in total compensation from the Company. This included $500,000 in salary, $250 in bonuses, $269,120 in non-equity incentive plan compensation, and $42,158 in all other compensation. For the 2022 Fiscal Year, Defendant Bezdek received $537,005 in total compensation from the Company. This included $500,000 in salary, $571 in bonuses, and $36,434 in all other compensation. For the 2021 Fiscal Year, Defendant Bezdek received $891,681 in total compensation from the Company. This included $500,000 in salary, $334 in bonuses, $357,176 in non-equity incentive plan compensation, and $34,171 in all other compensation. For the 2020 Fiscal Year, Defendant Bezdek received $267,652,442 in total compensation from the Company. This included $500,000 in salary, $451 in bonus awards, $266,662,480 in stock awards, $480,000 in non-equity incentive plan compensation, and $9,511 in all other compensation.

19.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Bezdek made the following sales of Company Class A common stock:

| Date | Number of Shares | Average Price/Share | Proceeds |
|------|------------------|---------------------|----------|
| 03/22/2021 | 131,066 | $36.77 | $4,819,296 |
| 06/23/2021 | 94,855 | $37.90 | $3,595,004 |
| 06/24/2021 | 34,520 | $38.48 | $1,328,329 |
| 09/24/2021 | 123,370 | $45.19 | $5,620,280 |
| 09/27/2021 | 5,004 | $43.27 | $216,523 |
| 12/22/2021 | 64,271 | $35.19 | $2,261,696 |
| 12/23/2021 | 65,104 | $33.98 | $2,212,233 |

20.    In total, before the fraud was exposed, Defendant Bezdek sold 519,190 shares of Company Class A common stock on inside information, for which he received approximately $20,053,364 in proceeds. Bezdek's insider sales, made with knowledge of material non-public information before the material misstatements and

omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

21.    **Defendant Christopher Adams** ("Adams") has served as a Company director since October 2015.    Defendant Adams also serves the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee.

22.    **Defendant Julie Bradley** ("Bradley") has served as a Company director since August 2020. She also serves as the Chair of the Audit Committee.  For the 2023 Fiscal Year, Defendant Bradley received $272,525 in total compensation from the Company. This included $50,000 in salary and $222,525 in stock awards. For the 2022 Fiscal Year, Defendant Bradley received $210,798 in total compensation from the Company. This included $50,000 in salary and $160,798 in stock awards. For the 2021 Fiscal Year, Defendant Bradley received $277,536 in total compensation from the Company. This included $50,000 in salary and $227,536 in stock awards. For the 2020 Fiscal Year, Defendant Bradley received $748,207 in total compensation from the Company. This included $5,707 in salary and $742,500 in stock awards.

23.    **Defendant Dipanjan Deb** ("Deb") has served as a Company director since August 2015.

24.    **Defendant Agnes Rey-Giraud** ("Rey-Giraud") has served as a Company director since June 2016. She also serves as the Chair of the Compliance Committee and as a member of the Audit Committee.  For the 2023 Fiscal Year, Defendant Rey-Giraud received $269,525 in total compensation from the Company. This included $47,000 in salary and $222,525 in stock awards. For the 2022 Fiscal Year, Defendant Rey-Giraud received $207,798 in total compensation from the Company. This included $47,000 in salary and $160,798 in stock awards. For the 2021 Fiscal Year, Defendant Rey-Giraud received $276,199 in total compensation from the Company. This included $48,663 in salary and $227,536 in stock awards. For the 2020 Fiscal

SHAREHOLDER DERIVATIVE COMPLAINT

Year, Defendant Rey-Giraud received $118,601 in total compensation from the Company. This included $21,359 in salary and $97,242 in option awards.

25.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Rey-Giraud made the following sales of Company Class A common stock:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| 09/16/2021 | 5,909 | $45.01 | $265,964 |
| 09/14/2021 | 14,454 | $45.00 | $650,430 |
| 09/15/2021 | 4,637 | $45.03 | $208,804 |
| 09/07/2021 | 54,370 | $41.56 | $2,259,617 |
| 04/01/2021 | 25,000 | $40.01 | $1,000,250 |
| 03/22/2021 | 25,000 | $36.38 | $909,500 |

26.    In total, before the fraud was exposed, Defendant Rey-Giraud sold 129,370 shares of Company Class A common stock on inside information, for which she received approximately $5,294,565 in proceeds. Defendant Rey-Giraud's insider sales, made with knowledge of material non-public information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the scheme.

27.    **Defendant Adam Karol** ("Karol") served as a Company director from 2018 until March 2024.  Defendant Karol also served as a member of the Compliance Committee.

28.    **Defendant Jacqueline Kosecoff** ("Kosecoff") served as a Company director from 2016 until July 2023.  For the 2023 Fiscal Year until his resignation, Defendant Kosecoff received $65,439 in total compensation from the Company. This included $33,750 in salary and $31,689 in stock awards. For the 2022 Fiscal Year, Defendant Kosecoff received $151,798 in total compensation from the Company. This included $45,000 in salary and $106,798 in stock awards. For the 2021 Fiscal Year, Defendant Kosecoff received $267,003 in total compensation from the Company. This

SHAREHOLDER DERIVATIVE COMPLAINT

included $39,467 in salary and $227,536 in stock awards. For the 2020 Fiscal Year, Defendant Kosecoff received $121,842 in total compensation from the Company. This included $25,242 in salary and $96,600 in option awards.

29. **Defendant Stephen Lesieur** ("Lesieur") served as a Company director from 2015 until March 2024.  Defendant Lesieur also served on the Compliance Committee and the Nominating and Corporate Governance Committee.

30. **Defendant Gregory Mondre** ("Mondre") has served as a Company since October 2018.  Defendant Mondre is currently the Chair of the Compensation Committee and a former member of the Nominating and Corporate Governance Committee.  Defendant Mondre resigned from the Nominating and Corporate Governance Committee in July 2023.

31. The above-named defendants at ¶¶ 15–30 are collectively referred to herein as the "Director Defendants."

**Officer Defendants**

32. **Defendant Karsten Voermann** ("Voermann") has served as the Company's CFO since March 2020.  For the 2023 Fiscal Year, Defendant Voermann received $902,242 in total compensation from the Company. This included $450,000 in salary, $163,105 in bonuses, $242,208 in non-equity incentive plan compensation, and $46,929 in all other compensation. For the 2022 Fiscal Year, Defendant Voermann received $5,235,060 in total compensation from the Company. This included $439,000 in salary, $205,395 in bonuses, $4,541,371 in stock awards, and $49,294 in other compensation. For the 2021 Fiscal Year, Defendant Voermann received $520,970 in total compensation from the Company. This included $428,000 in salary, $250 in bonuses, $91,723 in non-equity incentive plan compensation, and $997 in all other compensation.

SHAREHOLDER DERIVATIVE COMPLAINT

33.    During the Relevant Period, while the Company's stock price was artificially inflated and before the scheme was exposed, Defendant Voermann made the following sales of Company Class A common stock:

| Date | Number of Shares | Average Price/Share | Proceeds |
|---|---|---|---|
| 03/29/2021 | 150,000 | $37.76 | $5,664,000 |
| 04/28/2021 | 12,500 | $40.64 | $508,000 |
| 05/28/2021 | 12,500 | $38.39 | $479,875 |
| 07/28/2021 | 12,500 | $32.69 | $408,625 |
| 08/30/2021 | 12,500 | $37.35 | $466,875 |
| 09/28/2021 | 7,500 | $40.87 | $306,525 |
| 11/01/2021 | 12,500 | $22.02 | $275,250 |
| 12/01/2021 | 12,500 | $39.29 | $491,125 |
| 12/28/2021 | 12,500 | $33.05 | $413,125 |

34.    In total, before the fraud was exposed, Defendant Voermann sold 245,000 shares of Company Class A common stock on inside information, for which he received approximately $9,013,400 in proceeds. Defendant Voermann's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the scheme.

35.    Defendant Voermann along with Defendants Hirsch and Bezdek are collectively referred to herein as the "Officer Defendants."

36.    The Officer Defendants along with the Director Defendants are collectively referred to herein as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

37.    GoodRx operates a price comparison platform for prescription medicines, processing billions of data points every day. Consumers can access GoodRx's price comparison platform though its website and apps that can be used on computers, cell

phones, and other electronic devices. Central to GoodRx's business model is its ability to offer consumers reduced prices for medicines at pharmacies that have agreed to accept the discounts offered by GoodRx. GoodRx claims that, in many cases, the discounted prices it offers consumers are lower than their insurance co-pays.

38.    GoodRx generates most of its revenue from contracts with PBMs who agree to pay GoodRx a commission on prescription drug purchases made by consumers who use GoodRx's discount codes and coupons at participating pharmacies. The Company's revenue model works as follows. PBMs negotiate with pharmacies to determine a discounted, negotiated rate for prescription drugs that consumers will pay at the pharmacy. GoodRx then advertises and issues codes and coupons to consumers redeemable for this discounted rate. When a transaction occurs in which a consumer fills a prescription using a GoodRx code or coupon, the PBM receives a portion of the price that the consumer paid to the pharmacy. GoodRx then receives a percentage of this amount or a fixed payment from the PBM as compensation for directing the consumer to that PBM's pricing and the pharmacy.

39.    GoodRx also generates a portion of its revenue from subscription plans like the Kroger Rx Savings Club. Subscribers pay an annual upfront fee for a subscription that provides access to lower prices on prescriptions at Kroger pharmacies. At the commencement of the subscription term, subscribers pay an annual fee to GoodRx which the Company shares with Kroger. GoodRx also generates revenue from the prescriptions purchased at Kroger.

## **FALSE AND MISLEADING STATEMENTS**

40.    The Relevant Period begins on September 23, 2020, to coincide with GoodRx's IPO. In the IPO prospectus filed on September 22, 2020, the Company touted as one of its main strengths the widespread and diversified acceptance of GoodRx discounts, stating that "[c]onsumers can use GoodRx at over 70,000 pharmacies, nearly every retail pharmacy in the United States," and that the

Company's "proprietary technology platform . . . can be used to save money at every major retail pharmacy."

41.     In particular, in a section entitled "How We Make Money," the IPO prospectus stated, in relevant part:

> When a consumer uses a GoodRx code to fill a prescription … we receive fees from our partners, primarily PBMs… Revenue from prescription transactions fees made up approximately 94% of our revenue in 2019 and 91% of revenue in the first half of 2020. We have seen strong repeat activity on our platform due to the typical refill cycle and long-term nature of most prescriptions.
>
> ***Subscription Offerings***: Our subscription offerings are a natural extension of our successful prescription offering … We launched … Kroger Savings, in 2018. We receive subscriptions fees from subscribers for these offerings, and for Kroger Savings we share a portion of these fees with Kroger. We recognize the subscription fees, net of Kroger's share, as revenue over the subscription period. We have significantly increased the number of subscribers who use our subscription offerings. The number of subscribers as of June 30, 2020 was 15 times higher than as of December 31, 2018. Based on our data for the cohort of consumers who started using our subscription offerings between July 2018 and June 2019, we estimate that consumers of our subscription offerings have a first year contribution of approximately two times that of consumers of our prescription offering, which we expect will result in a substantially higher lifetime value for these consumers. First year contribution represents the cumulative revenue generated by consumers in the first

SHAREHOLDER DERIVATIVE COMPLAINT

year after they became consumers of our subscription offerings, less our estimated cost of revenue attributable to such revenue.

42. GoodRx also highlighted the Kroger Rx Savings Club—which provides "access [to] lower prescription prices at Kroger pharmacies, including over 100 common generic medications for free, $3.00, or $6.00 price points, and savings on more than 1,000 other generic medications." The Company failed to disclose, however, its significant dependence on a single pharmacy chain—Kroger—and that, notwithstanding GoodRx's contractual agreement with Kroger forming the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts.

43. Indeed, in addressing risk factors specific to the Kroger Rx Savings Club, the IPO prospectus stated, "[t]hese risks and challenges include our ability to… increase and retain our consumers that subscribe to our subscription offerings, such as Gold and Kroger Savings." GoodRx once again failed to disclose Kroger's ability to unilaterally refuse acceptance of GoodRx's codes and coupons and failed to disclose the near 25% impact Kroger had on GoodRx's prescription transaction revenue.

44. In a series of ensuing industry conferences, certain Individual Defendants touted the Company's strong, long-lasting relationships with pharmacies, but failed to disclose pharmacies' ability to unilaterally stop accepting GoodRx discounts. For example, at the RBC Global Technology, Internet, Media and Telecommunications Conference (Virtual) on November 18, 2020, when discussing the Company's relationships with pharmacies, Defendant Hirsch stated that GoodRx had close business relationships with pharmacies "to the point where [the Company was] talking almost daily with [them]," and Defendant Voermann likewise explained that "pharmacies are our friends. . . . and we see that continuing far into the future."

45. Defendants also assured investors that the Company's relationships with pharmacies were strong because pharmacies could not set or advertise lower prices, while GoodRx, acting with PBMs, could. For example, at the Credit Suisse

- 13 -

Technology Conference (Virtual) on December 3, 2020, Defendant Hirsch explained that, "I know this is really hard for people to get through their head, but pharmacies cannot set their own prices without getting in a lot of trouble. . . . they cannot just wake up tomorrow and go, we're going to make every drug X dollars."

46.    As Defendant Hirsch reiterated a few days later at the UBS Global TMT Conference (Virtual) on December 8, 2020, pharmacies were dependent on GoodRx to set rates. To this end, Defendant Hirsch emphasized that GoodRx "help[s] PBMs . . . and pharmacies make money" because "[t]hey use us as a way to drive prices because they can't do it themselves."

47.    On March 11, 2021, the Company filed with the SEC its annual report on Form 10-K for the fourth quarter and full year 2020 (the "2020 10-K"). The 2020 10-K was signed by Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSiuer, Mondre, and Rey-Giraud. The 2020 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), signed by Defendants Hirsch, Bezdek, and Voermann, which attested to the accuracy of the filing and the Company's disclosure controls.

48.    In connection with the 2020 10-K, GoodRx again touted the Kroger Rx Savings Club, explaining that its "subscription offerings are a natural extension of our successful prescription offering" and "leverage[s] our relationships across the healthcare ecosystem and our product expertise to provide subscribers with even greater savings and convenience at select pharmacies." To this end, GoodRx emphasized that it "partner[s] with Kroger, the fourth largest retail pharmacy in the United States, to offer a tailored subscription product to Kroger consumers" and represented that the "subscription offerings are designed to be easy to use and provide subscribers with added benefits and features."

49.    Similarly, in connection with its annual report for the fourth quarter and full year 2021 (the "2021 10-K") filed with the SEC on February 28, 2022, GoodRx

again highlighted the Kroger Rx Savings Club, in which the Company "partner[s] with Kroger, one of the largest retail pharmacies in the United States, to offer a tailored subscription product to Kroger consumers." The 2021 10-K was signed by Defendants Hirsch, Bezdek, Voermann, Adams, Bradley, Deb, Karol, Kosecoff, LeSieur, Mondre, and Rey-Giraud. The 2021 10-K also contained SOX certifications signed by Defendants Hirsch, Bezdek, and Voermann.

50.    During GoodRx's investor earnings call held that same day to discuss the Company's fourth quarter and full-year 2021 financial results, Defendant Bezdek emphasized that the Company's "relationships with PBMs remain great. . . . [and GoodRx's] relationships with [pharmacies] are very good." Defendant Bezdek further noted that the Company had not "seen any significant changes or developments" with these partners that would have a material impact on financial results.

51.    Less than a month later at the Deutsche Bank Media, Internet and Telecom Conference on March 15, 2022, Defendant Voermann, when asked about possible pressures from the Company's partners (including pharmacies) that would disrupt the Company's revenue model, deflected the question and instead reiterated that GoodRx "ha[s] deep relationships with all of the big pharmacies out there. . . . [and] we feel like our relationship with all the big pharmacies, which is where all the volume flows through are really strong."

52.    The above-referenced statements were materially false and/or misleading when made because Defendants misrepresented and/or failed to disclose that: (i) while Kroger accounted for less than 5% of the pharmacies accepting GoodRx discounts, Kroger was responsible for nearly 25% of GoodRx's total prescription transactions revenue (the Company's primary revenue stream); and (ii) Kroger could unilaterally cease accepting GoodRx discounts, cutting off some or all of GoodRx's revenues for purchases at Kroger's pharmacies; and (iii) as a result, Defendants' representations

about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

### THE TRUTH BEGINS TO EMERGE

53.    On May 9, 2022, investors began to learn of the Company's over-dependence on Kroger and the risk that, notwithstanding GoodRx's contractual agreement with Kroger forming the Kroger Rx Savings Club, Kroger could unilaterally refuse to accept GoodRx's discounts. In connection with its announcement of its first quarter 2022 financial results that day, GoodRx revealed that it "recognized that a grocery chain had taken actions late in the first quarter of 2022 that impacted acceptance of discounted pricing for a subset of drugs from PBMs" and that this "is expected to have an adverse impact on prescription transactions revenue in the future that may be material." Critically, the Company admitted that the disruption "could have an estimated revenue impact of roughly $30 million" in the second quarter of 2022, prompting GoodRx to issue disappointing second quarter 2022 revenue guidance of only about $190 million. GoodRx also acknowledged that "it is unlikely we will be able to achieve the FY 2022 guidance we provided on our fourth quarter earnings call" and revealed that it "will not be providing full year expectations at this time as the full year impact of the grocer issue is difficult to estimate."

54.    During the Company's accompanying investor earnings call held the same day, Defendant Bezdek explained:

> This [issue] is [about] limiting acceptance of many [discount] programs at this grocer's pharmacy. This involves, to your point, essentially all PBMs. So this is across the vast majority of PBMs. . . . In this case, this grocer is negotiating with almost all PBMs at the same time, and that effectively meant that discount pricing became unavailable to consumers at the same time.

55.    The Company further disclosed that, while the grocery chain's pharmacies comprised less than 5% of GoodRx's network of pharmacies, the grocery chain accounted for "almost 1/4 of its prescription transactions revenue."

56.    While Defendants refused to identify the grocer, securities analysts who followed GoodRx—including analysts from Deutsche Bank and Barclays—concluded that the grocery chain was Kroger.

57.    In response to concerns regarding the significant impact of Kroger's actions, the price of GoodRx common stock plummeted $2.78 per share, or 25.9%, from a close of $10.75 per share on May 9, 2022, to close at $7.97 per share on May 10, 2022.

58.    Then on August 8, 2022, in an investor earnings call held in connection with the announcement of GoodRx's second quarter 2022 financial results, Defendant Bezdek informed investors that, as a result of the previously disclosed Kroger issue, "[w]e exited the second quarter seeing approximately 20% of the weekly volume we processed through [Kroger] before the issue beginning of March." Nevertheless, Defendant Bezdek sought to reassure investors and declared that "the grocer issue has been addressed."

59.    On November 8, 2022, in connection with the announcement of GoodRx's third quarter 2022 financial results, investors learned more about the Company's concentrated exposure to Kroger. As an initial matter, GoodRx revealed that "[t]he estimated impact of the grocer issue on third quarter [prescription transactions revenue] was approximately $40 million" and that, despite the previous quarter statement that "the grocer issue has been addressed," the Company expected "a combined $45 million to $50 million estimated impact to prescription transactions revenue related to the previously disclosed grocer issue and our continued consumer engagement efforts" in the fourth quarter of 2022.

60.     During the investor earnings call held the same day, Defendant Bezdek provided further clarity and disclosed that the "amount of prescription transactions revenue associated with the grocer decreased from $12.4 million to $4.3 million during th[e] period and [wa]s still well under the $33.7 million from third quarter 2021."

61.     Defendants also admitted that there continued to be a risk that pharmacies could unilaterally cease to accept GoodRx discounts, like Kroger had done. Specifically, Defendant Hirsch explained:

> We have continued to maintain our really strong PBM marketplace. But in addition, we are selectively direct contracting with pharmacies and including many of the largest chains. That hybrid model really lets us ensure network stability. We want to make sure we don't have and we don't anticipate having any similar issue [to the Kroger issue].

62.     In response, the price of GoodRx common stock declined an additional $1.18 per share, or 22.5%, from a close of $5.24 per share on November 8, 2022, to close at $4.06 per share on November 9, 2022.

## DAMAGE TO THE COMPANY

**Securities Class Action**

63.     On April 22, 2024, a securities class action complaint was filed in the United States District Court for the Central District of California against the Company and the Officer Defendants.  The complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and SEC Rule 10b-5, in the case captioned: *Barsuli v. GoodRx Holdings, Inc., et al.*, Case No. 2:24-cv-03282 (C.D. Cal.) ("Securities Class Action")

64.     As a result of the wrongs complained of herein, the Individual Defendants have subjected the Company to the significant cost of defending itself and certain of the Company's former officers.  The Company will continue to incur significant sums

SHAREHOLDER DERIVATIVE COMPLAINT

in relation to the above Securities Class Actions and any liability or settlement that results.

**Unjust Compensation**

65.    At all relevant times, the Company paid lucrative compensation to certain of the Individual Defendants. The Company paid the Individual Defendants in connection with their respective roles as officers and/or directors of the Company.

66.    Accordingly, as part of their respective roles, the Individual Defendants were required to, among other things, exercise due care and diligence in the management and administration of the affairs of the Company, act ethically and in compliance with all laws and regulations, maintain adequate internal controls, and conduct business in a fair and transparent manner.  Further, each of the Individual Defendants had additional duties and responsibilities owed to the Company by virtue of their executive, directorial and/or committee roles, as described *supra*, for which they were compensated for.

67.    However, the Individual Defendants failed to carry out their duties adequately or at all, causing harm to the Company, as alleged herein.  Because the Individual Defendants failed to carry out their respective duties, the compensation they received during the Relevant Period was excessive and undeserved.  As such, the Individual Defendants were unjustly enriched to the detriment of the Company.

**Share Repurchases**

68.    During the Relevant Period, the Individual Defendants caused the Company to initiate repurchases of its common stock that substantially damaged the Company. In total, the Company spent an aggregate amount of over $101.7 million to repurchase approximately 8,455,833 shares of its own common stock at artificially inflated prices from March 2022 through September 2022, as follows:

SHAREHOLDER DERIVATIVE COMPLAINT

| Date(s) | Shares Purchased | Average Share Price ($) | Price Paid ($) | Total Overpayment[1] |
|---|---|---|---|---|
| March 2022 | 5,637,005 | 14.86 | 83,765,894 | 60,879,654 |
| September 2022 | 2,818,828 | 6.37 | 17,955,934 | 6,511,492 |
| **TOTAL** | **8,455,833** | **--** | **101,721,828** | **67,391,146** |

69.    Accordingly, the Individual Defendants caused the Company's overpayment of approximately ***$67.39 million*** for repurchases of its own stock during the period when the Company's stock price was artificially inflated due to the false and misleading statements discussed herein.

**Additional Damages to the Company**

70.    In addition to the damages specified above, the Company will also suffer further losses in relation to any internal investigations and amounts paid to lawyers, accountants, and investigators in connection thereto.

71.    The Company will also suffer losses in relation to the Individual Defendants' failure to maintain adequate internal controls, including the expense involved with implementing and maintaining improved internal controls.

72.    As a direct and proximate result of the Individual Defendants' conduct, GoodRx has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's and their misrepresentations.

---

[1]    "Total Overpayment" is the amount that the Company overpaid for its own stock and is calculated by taking what the Company actually paid for the stock (the "Price Paid") and subtracting what the Company should have paid for the stock based on a share price of $4.06, the value of the Company's common stock on November 8, 2022 when the truth was revealed.

- 20 -

SHAREHOLDER DERIVATIVE COMPLAINT

## CORPORATE GOVERNANCE

### The Company's Code of Business Conduct and Ethics

73.     GoodRx's Code of Business Conduct and Ethics (the "Code of Conduct" or "Code") applies to all GoodRx employees, including "directors, officers and other employees." The "Introduction and Overview" to the Code of Conduct states the following, in relevant part:

> This Code of Business Conduct and Ethics (the "Code") contains general guidelines for conducting the business of GoodRx Holdings, Inc. (the "Company" or "we") consistent with the highest standards of business ethics. To the extent this Code requires a higher standard than required by commercial practice or applicable laws, rules or regulations, the Company adheres to these higher standards.

74.     Under the heading "Compliance with Laws and Regulations," the Code of Conduct states:

> Each employee and director has an obligation to comply with all laws, rules and regulations applicable to the Company's operations. These include, without limitation, laws covering bribery and kickbacks, copyrights, trademarks and trade secrets, information privacy, insider trading, illegal political contributions, antitrust prohibitions, foreign corrupt practices, offering or receiving gratuities, environmental hazards, employment discrimination or harassment, occupational health and safety, false or misleading financial information or misuse of corporate assets. You are expected to understand and comply with all laws, rules and regulations that apply to your job position. If any doubt exists about whether a course of action is lawful, you should seek advice from your supervisor or the Company's General Counsel.

SHAREHOLDER DERIVATIVE COMPLAINT

75.     Under the heading "Compliance with Insider Trading Laws," within the "Compliance with Laws and Regulations" section, the Code of Conduct states in relevant part that, "the Company's employees and directors are prohibited from trading in the stock or other securities of the Company while in possession of material nonpublic information about the Company."

76.     In the section titled "Public Communications Generally," the Code of Conduct further states:

> The Company places a high value on its credibility and reputation in the community. What is written or said about the Company in the news media and investment community directly impacts our reputation, positively or negatively. Our policy is to provide timely, accurate and complete information in response to public requests (from media, analysts, etc.), consistent with our obligations to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data. The Company has adopted a separate Policy Statement – Guidelines for Corporate Disclosure to maintain the Company's credibility and reputation in the community, to maintain the confidentiality of competitive and proprietary information and to prevent selective disclosure of market-sensitive financial data.

77.     In a section titled "Company Records," the Code of Conduct makes it clear that "[a]ccurate and reliable records are crucial to our business." The Code of Conduct further goes on to state, "[a]ll Company records must be complete, accurate and reliable in all material respects. Each employee and director must follow any formal document retention policy of the Company with respect to Company records within such employee's or director's control."

78.     Additionally, in a section titled "Accuracy of Financial Reports and Other Public Communications," the Code of Conduct provides:

SHAREHOLDER DERIVATIVE COMPLAINT

As a public company we are subject to various securities laws, regulations and reporting obligations. Both federal law and our policies require the disclosure of accurate and complete information regarding the Company's business, financial condition and results of operations. Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability.

The Company's principal financial officers and other employees working in the finance department have a special responsibility to ensure that all of our financial disclosures are full, fair, accurate, timely and understandable. These employees must understand and strictly comply with generally accepted accounting principles and all standards, laws and regulations for accounting and financial reporting of transactions, estimates and forecasts.

79.    While the Code of Conduct does allow directors and executives to waive provisions of the Code of Conduct, they may only do so with the permission of either the Board or the Audit committee. The Code of Conduct emphasizes that any waiver "will be disclosed to the public as required by law or the rules of The Nasdaq Stock Market LLC, when applicable."

**GoodRx's Corporate Governance Guidelines**

80.    The Company also maintains "Corporate Governance Guidelines" (the "Governance Guidelines"). Under the section titled "Director Responsibilities," the Governance Guidelines state:

The business and affairs of the Company will be managed by or under the direction of the Board, including through one or more of its committees as set forth in the bylaws and committee charters. Each director is

- 23 -

expected to spend the time and effort necessary to properly discharge his or her responsibilities. These include:

- exercising their business judgment in good faith;

- acting in what they reasonably believe to be the best interest of all stockholders;

- becoming and remaining well-informed about the Company's business and operations and general business and economic trends affecting the Company; and

- ensuring that the business of the Company is conducted so as to further the long-term interests of its stockholders.

81.    In violation of the Code of Conduct and the Governance Guidelines, the Individual Defendants conducted little, if any, oversight of the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including but not limited to breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. Moreover, four Individual Defendants violated the Code of Conduct by engaging in insider trading, netting proceeds exceeding $54.7 million.  Also, in violation of the Governance Guidelines, the Individual Defendants failed to maintain the accuracy of GoodRx's records and reports, failed to maintain internal controls, and failed to comply with laws and regulations, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct.

***GoodRx's Audit Committee Charter***

82.    GoodRx's Audit Committee Charter ("Audit Committee Charter") states that the purpose of the Audit Committee is:

to (i) oversee the accounting and financial reporting processes of GoodRx Holdings, Inc. (the "Company") and the audits of the financial statements

- 24 -

of the Company, (ii) assist the Board in overseeing the overall risk management of the Company and oversee certain material risk exposures of the Company and (iii) oversee the Company's internal audit function.

The Committee's responsibilities are limited to oversight. The Company's management is responsible for establishing and maintaining accounting policies and procedures in accordance with generally accepted accounting principles ("GAAP") and other applicable reporting and disclosure standards and for preparing the Corporations' financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

83.      The Audit Committee Charter states that, regarding annual financial statements and financial reporting, the duties and responsibilities of the Audit Committee are as follows:

•       Audit Problems. The Committee must discuss with the independent auditor any audit problems, financial reporting issues or difficulties in connection with the preparation of the Company's financial statements and management's response.

•       Form 10-K Review. The Committee must review and discuss the annual audited financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

•       Audit Committee Report. The Committee must provide the Company with the report of the Committee with respect to the audited financial statements for inclusion in each of the Company's annual proxy statements.

SHAREHOLDER DERIVATIVE COMPLAINT

84.      The Audit Committee Charter states that, regarding quarterly financial statements and financial reporting, the duties and responsibilities of the Audit Committee are as follows:

•      Form 10-Q Review. The Committee must review and discuss the quarterly financial statements with management and the independent auditor, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

85.      The Audit Committee Charter states under the heading "Risk Assessment and Risk Management," that: "[t]he Committee must review and discuss the Company's policies and procedures with respect to risk assessment and risk management and shall oversee certain of the Company's major risk exposures as set forth below." The duties and responsibilities of the Audit Committee are as follows:

•      Financial and Enterprise Risk. The Committee will review and assess, at least annually, the Company's major financial and enterprise risk exposures, including fraud risks, and the steps management has taken to monitor or mitigate such exposures.

•      Other Risk Oversight. The Committee will review and assess the Company's risk exposures in other areas, as the Committee deems necessary or appropriate from time to time; however, the Committee shall not be responsible for the detailed oversight of any risk exposures that have been delegated by the Board to another committee of the Board.

86.      The Audit Committee Charter also requires the Audit Committee to "periodically consider and discuss with management and the independent auditor the

Company's Code of Business Conduct and Ethics … and the procedures in place to enforce the Code."

87.    In addition, GoodRx's Audit Committee Charter requires that the Audit Committee "must periodically perform an evaluation of the performance of the Committee."

88.    In violation of the Audit Committee Charter, the Individual Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of Section 10(b) of the Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company records and reports, comply with laws and regulations, act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## DUTIES OF THE DIRECTOR DEFENDANTS

89.    As members of the Board, the Director Defendants were held to the highest standards of honesty and integrity and charged with overseeing the Company's business practices and policies and assuring the integrity of its financial and business records.

90.    The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its investors that the Director Defendants were aware posed a risk of serious injury to the Company.

91.    By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of

the Company, the Director Defendants owed the Company and its investors the fiduciary obligations of trust, loyalty, and good faith. The obligations required the Director Defendants to use their utmost abilities to control and manage the Company in an honest and lawful manner. The Director Defendants were and are required to act in furtherance of the best interests of the Company and its investors.

92.     Each director of the Company owes to the Company and its investors the fiduciary duty to exercise loyalty, good faith, and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets. In addition, as officers and/or directors of a publicly held company, the Director Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, finances, and financial condition, as well as present and future business prospects, so that the market price of the Company's stock would be based on truthful and accurate information.

93.     To discharge their duties, the officers and directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the affairs of the Company. By virtue of such duties, the officers and directors of the Company were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and investing public;

(b)     conduct the affairs of the Company in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's business prospects, and ensuring that

the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(d)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiries in connection therewith, take steps to correct such conditions or practices, and make such disclosures as necessary to comply with federal and state securities laws;

(e)     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, and rules and regulations; and

(f)     ensure that all decisions were the product of independent business judgment and not the result of outside influences or entrenchment motives.

94.     Each Director Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Director Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Director Defendants were aware, or should have been aware, posed a risk of serious injury to the Company.

95.     The Director Defendants breached their duties of loyalty and good faith by causing the Company to issue false and misleading statements concerning the financial condition of the Company.  As a result, the Company has expended, and will continue to expend, significant sums of money related to investigations and lawsuits and to structure settlements to resolve them, as detailed *supra*.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

- 29 -

SHAREHOLDER DERIVATIVE COMPLAINT

96.     Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breaches of fiduciary duties and gross mismanagement by the Director Defendants.

97.     Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting its rights and has retained counsel competent and experienced in derivative litigation.

98.     Plaintiff is a current owner of the Company stock and has continuously been an owner of Company stock during all times relevant to the Director Defendants' wrongful course of conduct alleged herein.  Plaintiff understands his obligation to hold stock throughout the duration of this action and is prepared to do so.

99.     During the illegal and wrongful course of conduct at the Company and through the present, the Board consisted of the Director Defendants.  Because of the facts set forth throughout this Complaint, demand on the Company Board to institute this action is not necessary because such a demand would have been a futile and useless act.

100.    At the time this derivative lawsuit was commenced, GoodRx's Board consisted of ten (10) directors -- Hirsch, Bezdek, Adams, Bradley, Deb, Mondre, Rey-Giraud, (the "Director Defendants") and non-parties Kelly Kennedy, Simon Patterson, and Ian T. Clark. Accordingly, Plaintiff must show that a majority of the Board, *i.e.*, five (5) of the Directors, cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute it.

101.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

102.    The Director Defendants (or at the very least a majority of them) cannot exercise independent objective judgment about whether to bring this action or whether

SHAREHOLDER DERIVATIVE COMPLAINT

to vigorously prosecute this action. For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

103. Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

104. Each of the Director Defendants authorized and/or permitted the false statements to be disseminated directly to the public and made available and distributed to shareholders, authorized and/or permitted the issuance of various false and misleading statements, and are principal beneficiaries of the wrongdoing alleged herein, and thus, could not fairly and fully prosecute such a suit even if they instituted it.

105. The Director Defendants cannot consider a demand because (i) their decision to operate GoodRx in violation of the law is not a protected business decision and (ii) they all face a substantial likelihood of liability for breaching their duties of loyalty and good faith. The Director Defendants were either informed of GoodRx's overreliance on Kroger and that Kroger could unilaterally refuse GoodRx's discount pricing mechanisms and failed to take action or are consciously violating their duty to stay informed about the core business of GoodRx. Such a decision could not have been an action taken in good faith and is accordingly not protected by the business judgment rule. Furthermore, the conscious failure of the Director Defendants to act in the face of the overwhelming number of warnings is a breach of the duties of care and loyalty. This breach subjects them to a substantial likelihood of liability. Since demand on the majority of the Board is futile, demand is excused.

SHAREHOLDER DERIVATIVE COMPLAINT

106.     Despite the Individual Defendants having knowledge of the history of their own misconduct and mismanagement, the Director Defendants have failed and refused to seek recovery for GoodRx for any of the misconduct alleged herein.

## THE DIRECTORS ARE NOT
## INDEPENDENT OR DISINTERESTED

**Defendant Hirsch**

107.     Defendant Hirsch is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its Co-CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Hirsch cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

108.     As CEO, Defendant Hirsch also fails the NASDAQ's bright-line independence test and cannot, therefore, be considered independent. As such, Defendant Hirsch could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Hirsch is therefore futile.

109.     As a trusted Company director, Defendant Hirsch conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

110.     In addition, Defendant Hirsch receives lucrative compensation in connection with his employment with the Company, including $784,856 for the 2023 Fiscal Year, $507,290 for the 2022 Fiscal Year, $879,104 for the 2021 Fiscal Year, and $267,650,186 for the 2020 Fiscal Year. Defendant Hirsch is not independent from Defendants Adams and Mondre as they comprise the Compensation Committee and

SHAREHOLDER DERIVATIVE COMPLAINT

are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Hirsch. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers. Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Hirsch could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

111.    As the Company's co-founder, former highest officer, current officer, and influential member of the Board, Defendant Hirsch was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period, including the false and misleading statements in the Prospectus, the 2020 10-K, 2021 10-K, the Q1 2022 10-Q, the Q2 2022 10-Q, and the Q3 2022 10-Q, all of which he signed. In addition, Defendant Hirsch issued false and misleading statements during the relevant earnings call pursuant to each relevant quarter above, and personally made false and misleading statements during various industry conferences.

112.    Because of Defendant Hirsch's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Hirsch is unable to comply with his fiduciary duties and prosecute this action. Defendant Hirsch is in a position of irreconcilable conflict of interest in terms of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

113.    Further, Defendant Hirsch, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. In particular, Defendant Hirsch sold 519,190 shares of Company stock for gross proceeds of $20.4 million. As a result of

his unlawful and improper insider trading, Defendant Hirsch faces a substantial likelihood of liability and cannot be considered independent nor disinterested.

114.    Moreover, Defendant Hirsch signed and therefore personally made the false and misleading statements contained in the Prospectus, subsequent amendments, and the above-referenced Quarterly Reports filed on Form 10-Q and faces a substantial likelihood of liability therefor.

115.    Defendant Hirsch is neither independent nor disinterested. Any demand upon Defendant Hirsch is futile and, thus, excused.

**Defendant Bezdek**

116.    Defendant Bezdek is neither disinterested nor independent, and therefore, is incapable of considering demand because he (as its Co-CEO) is an employee of the Company who derives substantially all of his income from his employment with the Company, making him not independent.  As such, Defendant Bezdek cannot independently consider any demand to sue himself for breaching his fiduciary duties to the Company, because that would expose him to liability and threaten his livelihood.

117.    As CEO, Defendant Bezdek also fails the NASDAQ's bright-line independence test and cannot, therefore, be considered independent. As the Company admits, "Mr. Bezdek, as one of our former Co-Chief Executive Officers and an employee of the Company, does not qualify as independent under the current Nasdaq Rules." As such, Defendant Bezdek could not objectively and disinterestedly consider a demand to sue the Individual Defendants and any demand upon Defendant Bezdek is therefore futile.

118.    As a trusted Company director, Defendant Bezdek conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting

and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

119.    In addition, Defendant Bezdek receives lucrative compensation in connection with his employment with the Company, including $811,528 for the 2023 Fiscal Year, $537,005 for the 2022 Fiscal Year, $891,681 for the 2021 Fiscal Year, and $267,652,442 for the 2020 Fiscal Year. Defendant Bezdek is not independent from Defendants Adams and Mondre as they comprise the Compensation Committee and are responsible for evaluating and determining the compensation of the CEO and Executive Officers, including Defendant Bezdek. The purpose of the Compensation Committee is to assist the Board in discharging its responsibilities related to the compensation provided by the Company to its CEO and Executive Officers.  Because of his status as an inside director, and the concomitant substantial compensation he receives, Defendant Bezdek could not consider a demand adverse to the other Director Defendants serving on the Compensation Committee who are responsible for his financial future.

120.    As the Company's co-founder, former highest officer, current officer, and influential member of the Board, Defendant Bezdek was ultimately responsible for the issuance of all of the false and misleading statements during the Relevant Period, including the false and misleading statements in the Prospectus, the 2020 10-K, 2021 10-K, the Q1 2022 10-Q, the Q2 2022 10-Q, and the Q3 2022 10-Q, all of which he signed. In addition, Defendant Bezdek issued false and misleading statements during the relevant earnings call pursuant to each relevant quarter above, and personally made false and misleading statements during various industry conferences.

121.    Because of Defendant Bezdek's participation in the gross dereliction of fiduciary duties, and breaches of the duties of due care, good faith, and loyalty, Defendant Bezdek is unable to comply with his fiduciary duties and prosecute this action.  Defendant Bezdek is in a position of irreconcilable conflict of interest in terms

of the prosecution of this action and defending himself in the Securities Class Action, brought under the Securities Exchange Act of 1934.

122.     Further, Defendant Bezdek, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. In particular, Defendant Bezdek sold 519,190 shares of Company stock for gross proceeds of $20 million. As a result of his unlawful and improper insider trading, Defendant Bezdek faces a substantial likelihood of liability and cannot be considered independent nor disinterested.

123.     Moreover, Defendant Bezdek signed and therefore personally made the false and misleading statements contained in the Prospectus, subsequent amendments, and the above-referenced Quarterly Reports filed on Form 10-Q and faces a substantial likelihood of liability therefor.

124.     Defendant Bezdek is neither independent nor disinterested. Any demand upon Defendant Bezdek is futile and, thus, excused.

**Defendant Adams**

125.     Defendant Adams has served as a Company director at all relevant times hereto. As a director, Defendant Adams was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Adams failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

126.     As a trusted Company director, Defendant Adams conducted little, if any, oversight of the scheme to cause the Company to make false and misleading

SHAREHOLDER DERIVATIVE COMPLAINT

statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

127.    Defendant Adams personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Adams breached his fiduciary duties, faces a substantial likelihood of liability and is neither independent nor disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Bradley**

128.    Defendant Bradley has served as a Company director at all relevant times hereto. As a director, Defendant Bradley was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Bradley failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

129.    As a trusted Company director, Defendant Bradley conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

130.    Defendant Bradley personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, she

failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Bradley breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Deb**

131.    Defendant Deb has served as a Company director at all relevant times hereto. As a director, Defendant Deb was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner. Despite this, Defendant Deb failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

132.    As a trusted Company director, Defendant Deb conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

133.    Defendant Deb personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Deb breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Defendant Rey-Giraud**

SHAREHOLDER DERIVATIVE COMPLAINT

134.    Defendant Rey-Giraud has served as a Company director at all relevant times hereto. As a director, Defendant Rey-Giraud was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Rey-Giraud failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements

135.    As a trusted Company director, Defendant Rey-Giraud conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded her duties to protect corporate assets.

136.    Further, Defendant Rey-Giraud, while in possession of material, non-public information about the Company, sold copious amounts of Company stock at artificially inflated prices, reaping large proceeds as a result. In particular, Defendant Rey-Giraud sold 129,370 shares of Company stock for gross proceeds of $5.29 million. As a result of her unlawful and improper insider trading, Defendant Rey-Giraud faces a substantial likelihood of liability and cannot be considered independent nor disinterested.

137.    Defendant Rey-Giraud personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, she failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Rey-Giraud breached her fiduciary duties, faces a substantial likelihood of

SHAREHOLDER DERIVATIVE COMPLAINT

liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

**Defendant Mondre**

138.     Defendant Mondre has served as a Company director at all relevant times hereto. As a director, Defendant Mondre was required to, among other things: (i) ensure that the Company complied with its legal and regulatory obligations and requirements; (ii) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time; (iii) remain informed as to how the Company conducted its operations, make reasonable inquiries, and take steps to correct any improper conditions or practices; and (iv) ensure the Company was operated in a diligent, honest, and prudent manner.  Despite this, Defendant Mondre failed to fulfil these duties by permitting the false and misleading statements to be made and not correcting those statements.

139.     As a trusted Company director, Defendant Mondre conducted little, if any, oversight of the scheme to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor such controls over reporting and engagement in the scheme, and consciously disregarded his duties to protect corporate assets.

140.     Defendant Mondre personally signed the false and misleading Prospectus, 2020 10-K, and 2021 10-K. In addition, during the Relevant Period, he failed to correct the false and misleading statements alleged herein. For these reasons, Defendant Mondre breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

**Additional Reasons Demand is Futile**

141.     Each of the Director Defendants, individually and collectively, face a substantial likelihood of liability as a result of their intentional or reckless approval of

- 40 -

SHAREHOLDER DERIVATIVE COMPLAINT

the unnecessary and harmful repurchases that caused the Company to overpay by approximately $67.39 million for its own common stock during the Relevant Period. The Director Defendants, as alleged herein, were aware or should have been aware of the misinformation being spread by the Company and yet approved the repurchases. Thus, the Director Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

142.    The Director Defendants have extensive, longstanding business and personal relationships with each other and the Individual Defendants that preclude them from acting independently and in the best interests of the Company and its shareholders. For instance, Defendants Hirsch and Bezdek co-founded the Company, previously served as the co-CEOs of the Company together during the Relevant Period and have served on its Board since 2011. Similarly, Defendants Adams and Deb have served on the Board since 2015, and Director-Defendant Rey-Giraud has served on the Board since 2016. These conflicts of interest preclude Director-Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud from adequately monitoring the Company's operations and internal controls and calling into question the Individual Defendants' conduct. Thus, demand upon Defendants Hirsch, Bezdek, Adams, Deb, and Rey-Giraud is futile.

143.    Defendants Rey-Giraud and Bradley served as members of the Audit Committee at all relevant times (collectively, the "Audit Committee Defendants"). As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Audit Committee Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of

SHAREHOLDER DERIVATIVE COMPLAINT

fiduciary duty and violations of the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and the Code of Conduct. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

144.     In violation of the Code of Conduct, the Director Defendants conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act. In further violation of the Code of Conduct, the Director-Defendants failed to comply with laws and regulations, maintain the accuracy of Company records and reports, avoid conflicts of interest, conduct business in an honest and ethical manner, and properly report violations of the Code of Conduct. Thus, the Director Defendants face a substantial likelihood of liability and demand is futile as to them.

145.     GoodRx has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against themselves or any others who were responsible for that wrongful conduct to attempt to recover for GoodRx any part of the damages GoodRx suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

146.     The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director Defendants can claim exculpation from their violations of duty pursuant to

the Company's charter (to the extent such a provision exists). As a majority of the Director Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

147.    The acts complained of herein constitute violations of fiduciary duties owed by GoodRx's officers and directors, and these acts are incapable of ratification.

148.    The Director Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds, *i.e.*, monies belonging to the stockholders of GoodRx. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director Defendants, known as, inter alia, the "insured-versus-insured exclusion."  As a result, if the Director Defendants were to sue themselves or certain of the officers of GoodRx, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

149.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause GoodRx to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

150.    Thus, for all of the reasons set forth above, all of the Director Defendants, and, if not all of them, at least five the Director Defendants, cannot

SHAREHOLDER DERIVATIVE COMPLAINT

consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## CLAIMS FOR RELIEF

## FIRST CAUSE OF ACTION

### (Against The Individual Defendants for Breach of Fiduciary Duties)

151.    Plaintiff incorporates by reference and re-allege each and every allegation contained above, as though fully set forth herein.

152.    The Individual Defendants owe the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed and owe the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

153.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

154.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by allowing the Company to improperly misrepresent the Company's publicly reported financials. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

155.    The Individual Defendants also breached their fiduciary duties of loyalty and good faith by making false and/or misleading statements and/or filing to disclose that: (i) while Kroger accounted for less than 5% of the pharmacies accepting GoodRx discounts, Kroger was responsible for nearly 25% of GoodRx's total prescription transactions revenue (the Company's primary revenue stream); and (ii) Kroger could unilaterally cease accepting GoodRx discounts, cutting off some or all of GoodRx's revenues for purchases at Kroger's pharmacies; and (iii) as a result, Defendants' representations about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis.

SHAREHOLDER DERIVATIVE COMPLAINT

156.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, the Company has sustained significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

157.    As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill.  Such damage includes, among other things, costs associated with defending securities lawsuits, severe damage to the share price of the Company, resulting in an increased cost of capital, the waste of corporate assets, and reputational harm.

**SECOND CAUSE OF ACTION**

**(Against the Individual Defendants for Waste of Corporate Assets)**

158.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

159.    The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the Relevant Period.  It resulted in continuous, connected, and ongoing harm to the Company.

160.    As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying excessive compensation and bonuses to certain of its executive officers; (ii) awarding self-interested stock options to certain officers and directors; and (iii) incurring potentially millions of dollars of legal liability and/or legal costs to defend the Individual Defendants' unlawful actions.

161.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

**THIRD CAUSE OF ACTION**

SHAREHOLDER DERIVATIVE COMPLAINT

**(Against The Individual Defendants for Unjust Enrichment)**

162. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

163. By their wrongful acts, violations of law, and inaccurate and untruthful information and/or omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, the Company, as detailed *supra*.

164. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from the Company that was tied to the performance of the Company or its stock price or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct.

165. Plaintiff, as a shareholder and representative of the Company seeks restitution from Defendants and seek an order from this Court disgorging all profits, including from insider transactions, the redemption of preferred stock, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

## FOURTH CAUSE OF ACTION

### (Against Defendants Hirsch, Bezdek, Voermann, and Rey-Giraud for Insider Trading)

166. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167. California Corporations Code § 25402 makes it "unlawful for an issuer or any person who is an officer, director or controlling person of an issuer or any other person whose relationship to the issuer gives him access, directly or indirectly, to material information about the issuer not generally available to the public, to purchase

SHAREHOLDER DERIVATIVE COMPLAINT

or sell any security of the issuer in this state at a time when he knows material information about the issuer gained from such relationship which would significantly affect the market price of that security and which is not generally available to the public, and which he knows is not intended to be so available, unless he has reason to believe that the person selling to or buying from him is also in possession of the information."

168.    By reason of their fiduciary roles as officers, directors, and/or controlling persons of the Company, Defendants Hirsch, Bezdek, Voermann, and Rey-Giraud (the "Insider Trading Defendants") specifically owed the Company the highest obligation of due care, good faith, and loyalty.

169.    As officers, directors, and/or controlling persons of the Company, the Insider Trading Defendants were given access, directly or indirectly, to material information about the Company, as described above, which was not generally available to the public.

170.    When the Insider Trading Defendants sold their Company stock for a collective $54.7 million, as detailed *supra*, they were in possession of material, non-public information, as described above, and sold Company stock on the basis of such information; information which they each knew had a significant effect on the market price of the Company's stock.

171.    The information described above was proprietary, non-public information concerning the Company's business operations and financial condition.  It was a proprietary asset belonging to the Company, which the Insider Trading Defendants misappropriated to their own benefit when they sold holdings in Company stock. The Insider Trading Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Company stock.

SHAREHOLDER DERIVATIVE COMPLAINT

172.     The Insider Trading Defendants have each violated California
Corporations Code § 25402, and any other applicable state and federal laws, as well as
their fiduciary duty of loyalty, by engaging in illicit insider trading.

173.     As the use of the Company's proprietary information for their own
personal gain constitutes a breach of the Insider Trading Defendants' fiduciary duties,
the Company is entitled to disgorge any illegal profits obtained thereby.

**FIFTH CAUSE OF ACTION**

**(Against the Individual Defendants for Violations of Section 10(b) of the
Exchange Act and Rule 10b-5 Promulgated Thereunder)**

174.     Plaintiff incorporates by reference and re-alleges each and every
allegation contained above, as though fully set forth herein.

175.     During the Relevant Period, the Individual Defendants disseminated
and/or approved public statements that failed to disclose that the above-referenced
truthful facts and as a result of the foregoing, the Individual Defendants' public
statements were materially false and misleading at all relevant times.  Thus, the price
of the Company's shares was artificially inflated due to the deception of the Individual
Defendants.  Despite this artificial inflation in the price of the Company's shares, the
Individual Defendants caused and/or allowed the Company to repurchase many
millions of shares of Company stock, thereby causing significant financial harm to the
Company.

176.     As alleged herein, the Individual Defendants acted with scienter in that
they knew that the public documents and statements issued or disseminated in the name
of the Company were materially false and misleading; knew that such statements or
documents would be issued or disseminated to the investing public; and knowingly
and substantially participated or acquiesced in the issuance or dissemination of such
statements or documents as primary violations of the federal securities laws.  As set
forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of
information reflecting the true facts regarding GoodRx, their control over, and/or

receipt and/or modification of GoodRx's allegedly materially misleading statements and/or their associations with the Company which made them privy to confidential proprietary information concerning GoodRx, participated in the fraudulent scheme alleged herein.

177.   The Individual Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Relevant Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

178.   The Individual Defendants were each members of GoodRx's Board of Directors and senior management team during the aforesaid time period.  Based on their roles at GoodRx, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein.

179.   At a minimum, the Individual Defendants failed to review or check information that they had a duty to monitor or ignored obvious signs that their statements were materially false and misleading or contained material omissions. Given the nature and extent of the problems at GoodRx, the Individual Defendants knew and/or recklessly disregarded the extent and scope of their statements during the Relevant Period.

180.   Likewise, the Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein.  The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading

SHAREHOLDER DERIVATIVE COMPLAINT

statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

181.   As such the Individual Defendants caused the Company to violate section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; and (ii)  made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

182.   As a result of the wrongful conduct as alleged herein, the Individual Defendants have violated Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5 promulgated thereunder and are thus liable for any harm caused to the Company.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment as follows:

A.   Determining that this action is a proper derivative action maintainable under law, and that demand is excused;

B.   Awarding, against all the Individual Defendants and in favor of the Company, the damages sustained by the Company as a result of the Individual Defendants' breaches of their fiduciary duties and other unlawful conduct;

C.   Awarding, against the Insider Trading Defendants, disgorgement of all illicit proceeds gained from their insider trading;

D.   Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures, to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its investors from a recurrence of the damaging events described herein;

E.   Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

F.   Granting such other and further relief as the Court deems just and proper.

SHAREHOLDER DERIVATIVE COMPLAINT

Dated: August 16, 2024                         Respectfully submitted,

                                          **WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

                              By: *s/ Alex J. Tramontano*
                                         Alex J. Tramontano

                              Betsy C. Manifold
                              750 B Street, Suite 2770
                              San Diego, CA  92101
                              Tel: (619) 239-4599
                              Fax: (619) 234-4599
                              tramontano@whafh.com
                              manifold@whafh.com

                              **GAINEY McKENNA & EGESTON**
                              Gregory M. Egleston
                              Thomas J. McKenna
                              260 Madison Avenue, 22nd Floor
                              New York, New York 10016
                              Phone: (212) 983-1300
                              Fax: (212) 983-0383
                              gegleston@gme-aw.com
                              tjmckenna@gme-law.com

                              ***Counsel for Plaintiff***

SHAREHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, JOSEPH CAETANO, declare that I have reviewed the Verified Shareholder Derivative Complaint ("Complaint") prepared on behalf of GoodRx Holdings, Inc. and authorize its filing. I have reviewed the allegations made in the Complaint, and to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely on my counsel and their investigation and for that reason believe them to be true. I further declare that I am a current holder, and have been a holder, of GoodRx Holdings, Inc. common stock at all relevant times.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

JOSEPH CAETANO